# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2019-0277, <u>Appeal of Donna M. Heald & a.</u>, the court on May 22, 2020, issued the following order:**

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case. The intervenors, Donna M. Heald, Regis Miller, Matthew and Amanda Fitch, Larry Gans, Ann Darragh, Tom and Yael DeCapo (collectively, the Durham Residents), and the Durham Historic Association (Historic Association), appeal a decision of the New Hampshire Site Evaluation Committee (SEC) granting the application filed by the petitioner, Public Service Company of New Hampshire d/b/a Eversource Energy (Eversource), for a "Certificate of Site and Facility" (Certificate) for the siting, construction, and operation of a new high voltage electric transmission line between existing substations in Madbury and Portsmouth (the Project). We affirm.

## I. Facts

The following facts were either found by the SEC or are drawn from the contents of documents submitted as part of the appellate record. In April 2016, Eversource applied to the SEC for a Certificate to install and operate a 12.9-mile transmission line, comprising aboveground, underground, and underwater segments, traversing portions of Madbury, Durham, Newington, and Portsmouth. The Project was selected by the Independent System Operator of New England (ISO-NE) to address identified transmission capacity needs for the continued reliability of the electric transmission system in the seacoast region. ISO-NE chose the Project, in 2012, as the preferred solution for increasing transmission system thermal capacity, increasing transformer thermal capacity, and improving system voltage performance, because "it is much less costly than the other alternative and addresses the needs in the area." (Quotation omitted.)

The overhead portion of the Project will be located entirely within existing distribution and transmission rights-of-way. The underground portion will be located in locally-maintained roads, on property in Durham now owned by Eversource, and on other property in Durham and Newington where Eversource has contracted to acquire new easements.

Pursuant to RSA 162-H:9 (2014), the attorney general appointed a Counsel for the Public, and, in late April 2016, a Subcommittee was appointed

to consider the application (Subcommittee). See RSA 162-H:4-a (Supp. 2019). After the Subcommittee accepted the application, finding that it contained sufficient information for the purposes of RSA chapter 162-H, public information sessions and, later, public hearings, were held in Durham and Newington. The Subcommittee granted motions to intervene filed by the intervenors and others.

Beginning in late August 2018, the Subcommittee held adjudicative hearings, receiving testimony and exhibits from many witnesses. The Subcommittee heard evidence through November 15, 2018, and deliberated over six days in November and December 2018. Its narrative decision, totaling more than 300 pages, was issued on January 31, 2019.

A.  Orderly Development of the Region

Relevant to this appeal, before granting the Certificate, the Subcommittee deliberated about whether the "site and facility will not unduly interfere with the orderly development of the region with due consideration having been given to the views of municipal and regional planning commissions and municipal governing bodies." RSA 162-H:16, IV(b) (Supp. 2019). In its deliberations, the Subcommittee observed that Newington and Durham had each entered into a Memorandum of Understanding with Eversource "addressing, minimizing, and mitigating" the Project's "construction impacts." The Subcommittee conditioned the Certificate upon Eversource's compliance with those Memoranda of Understanding.

In addition, the Subcommittee observed that, as to the Durham Residents and other intervenors, "the Applicant conducted a comprehensive outreach campaign where it contacted almost every intervenor who raised his/her concerns about the Project's impact and offered [a] variety of avoidance and mitigation measures that can be implemented to address their concerns."

Eversource asserted that the Project will not have "an unreasonable adverse effect" on real estate values in the region. Eversource's expert, Dr. James Chalmers, opined that, as to residential properties, given the "small number of properties" located within 100 feet of the rights-of-way, "there will be no discernable effects in local or regional real estate markets" as a result of the Project. Based upon Chalmers' testimony and report, the Subcommittee found that the Project will be partially or clearly visible from at least 29 properties, and that "[i]t is reasonable to conclude, depending on the extent of increase in visibility of the Project, that the Project will have some effect on values of some of these properties."

However, the Subcommittee identified "shortcomings" in the testimony and report. Specifically, the Subcommittee faulted Chalmers for "limit[ing] the area of impact" from the Project to properties located within 100 feet of the

2

rights-of-way and for opining that the value of real estate "will be impacted only if the Project was not previously visible and will become visible from the property or was partially visible and will become clearly visible." By so doing, the Subcommittee determined, Chalmers "failed to account . . . for significant change in visibility that will not result in clear visibility" and underestimated the number of properties likely to be impacted by the Project.

In light of those shortcomings, the Subcommittee found "it . . . reasonable to conclude that the Project will have some effect on values of additional properties, whether from visibility change or other Project impacts." Therefore, the Subcommittee conditioned the Certificate upon the creation of a voluntary dispute resolution process, described in more detail below, through which affected property owners could "address and mitigate such impacts." Under this process, which will be "available to all property owners who can verify the impact on the value of their property" and may be initiated up to two years after the Project's construction is completed, affected property owners will be able to mitigate impacts or receive financial reimbursement for them. Accordingly, considering Chalmers' "conclusion that only a limited number of properties [would] be impacted" and that property owners may mitigate those impacts through the voluntary dispute resolution process, the Subcommittee found "that the impacts of the Project on the value of real estate will not unduly interfere with the orderly development of the region." See id.

B. Public Interest

Also relevant to this appeal, before granting the Certificate, the Subcommittee deliberated about whether granting the Certificate would serve the public interest. See RSA 162-H:16, IV(e) (Supp. 2019). In its deliberations on this subject, the Subcommittee considered the "numerous comments from the Intervenors and members of the public indicating that the Project will have an adverse effect on aesthetics, historic sites, water quality, natural environment, value of real estate, tourism, land use, and public health and safety." See N.H. Admin. R., Site 301.16(a)-(j) (identifying the factors that must be considered "[i]n determining whether a proposed energy facility will serve the public interest").

The Subcommittee also considered that Eversource had "agreed to comply with a comprehensive and unprecedented set of conditions to ensure that impacts of the Project will be appropriately avoided, minimized, and mitigated," had "conducted a comprehensive outreach campaign to identify concerns raised by various parties," had "committed to implementing extensive vegetation measures," had agreed to place the Project "underground . . . in some sections . . . to address and mitigate [its] effect on aesthetics," and had agreed to "work with all landowners along the Project route that will be affected by tree trimming, tree clearing, or from the construction of taller structures in

3

the right-of-way to develop vegetation planting plans that do not interfere with the safe operation and maintenance of the new line."

In addition, the Subcommittee considered the conditions to which Eversource and Counsel for the Public had stipulated, those set forth in the Memoranda of Understanding between Eversource and Durham, Newington, and the University of New Hampshire, and those imposed by the New Hampshire Department of Environmental Services and other administrative agencies. The Subcommittee also considered the fact that ISO-NE had selected the Project over other alternatives "as the appropriate solution for addressing the reliability needs in the region."

The Subcommittee found that "[c]onsidering the testimony, evidence, and public comments, . . . the Project will have some negative impacts on aesthetics, historic sites, natural environment, water quality, private properties, and public health and safety," but that those impacts "will be minimized and mitigated through implementation of the conditions of the Certificate, various Memorand[a] of Understanding, the Dispute Resolution Procedure, and administrative agency permit conditions."

The Subcommittee found that the Project serves the public interest, in part, because it "will resolve reliability issues of the [electric] grid" and "ensure that extreme emergency situations will not cause the Seacoast region to face blackouts." The Subcommittee found that increasing the reliability of the electric system will, in turn, "improve the welfare of the population and stimulate growth and the economy" of the seacoast region.

After considering the Project's benefits and "all other relevant information pertaining to the factors [set forth] in [New Hampshire Administrative Rules, Site 301.16(a)-(j),]" the Subcommittee found that the Project will serve the public interest.

C.  Dispute Resolution Process

The voluntary dispute resolution procedure upon which the Certificate is conditioned includes the following steps. First, Eversource must "publicize, on its website and through its Project outreach communications, a summary of the [dispute resolution process] and contact information for business and property owners concerned about the potential or actual impacts of construction or operation of the Project on their business or property." Within ten days of being contacted, Eversource must "initiate direct discussions" with the business or property owner "to identify and implement appropriate strategies to avoid, mitigate, or compensate for potential or actual Project impacts on a case by case basis." If the business or property owner is unsatisfied with the proposed or implemented avoidance, mitigation, or compensation measures, then the business or property owner may request

4

"Executive Review" (review conducted independently of the Project team). If the business or property owner remains unsatisfied, the business or property owner may elect to participate in non-binding mediation. If the business or property owner remains unsatisfied and it "suffers damage to property, loss of business, or loss of income, and/or diminution in value of real property, as a result of the construction or operation of the Project," then the business or property owner may elect to participate in a "Dispute Resolution Process." If the business or property owner elects to participate in that process, the business or property owner waives the right to file a lawsuit in court, and the Dispute Resolution Process becomes the exclusive forum for deciding all disputed issues.

The Dispute Resolution Process will be administered by an attorney or a retired judge appointed by the SEC (the "Dispute Resolution Administrator"), who will handle "all disputes relating to damage to property, loss of business, or loss of income, and/or diminution in value of real property, caused by the construction or operation of the Project" that have not been resolved by Eversource's mitigation efforts, the Executive Review, or non-binding mediation. Counsel for the Public and Eversource must jointly or separately propose procedures for filing and deciding those disputes, "including criteria for eligibility, a procedure for filing claims, required proof of the damage, loss, or diminution, the presentation and consideration of claims, the basis for recovery and the manner of deciding claims." In addition, Eversource must establish a fund for the payment of claims, which will be administered by the Dispute Resolution Administrator. The Dispute Resolution Administrator shall issue a confidential, written decision on written requests for dispute resolution filed before the two-year anniversary date of the date when the transmission line is placed in service. The written decision and any reconsideration thereof are "final, non-appealable and non-precedential." "Notice of Final Decision shall be filed with the SEC Administrator."

### D. Motion to Reconsider

The Durham Residents filed a motion for rehearing, arguing, in part, that, by creating the Dispute Resolution Process, the Subcommittee had "improperly delegated its authority." The Durham Residents contended that "it was improper to authorize a dispute resolution administrator to review records and determine the nature and extent of impact on individual private properties" because, in their view, it is the Subcommittee's "obligation . . . to analyze the impact of the Project on private properties and to determine whether the Project will be in the public interest."

In addition, the Durham Residents asserted that the Dispute Resolution Process violates the Right-to-Know Law, see RSA ch. 91-A (2013 & Supp. 2019), because final decisions by the Dispute Resolution Administrator will be

5

"confidential." The Durham Residents also argued that, by establishing the Dispute Resolution Process, the Subcommittee "shifted the burden of demonstrating the impact of the Project on private properties to the private property owners," and that it "unconstitutionally interferes with [their] right to file suit."

In rejecting the above arguments, the Subcommittee asserted that the Durham Residents had "mischaracterize[d] the record." The Subcommittee stated that it "did not delegate the authority to a third-party to ascertain the impact of the Project on private property," but rather "set forth a mitigation mechanism that will be available to the property owners on a voluntary basis." The Subcommittee explained that, although it considered the availability of the voluntary dispute resolution procedure, its determination that the Project's impact on real estate values would not interfere with the orderly development of the region and would serve the public interest was based "on the record and evidence presented." The Subcommittee explained that the voluntary dispute resolution process is a measure imposed to "mitigate and minimize the impact" of the Project "on private properties." Implementation of such a measure, the Subcommittee stated, "does not shift the burden of proof, or delegate non-delegable authority."

The Subcommittee also ruled that the Dispute Resolution Process does not violate the Right-to-Know Law, but rather "will be administrated by an independent third party who will be compensated by funds that will be provided by [Eversource]." The Subcommittee observed that the procedure is "a purely voluntary option that the parties may choose[;] [t]he parties are free to decide not to use the procedure and seek a resolution of disputes in another forum." Accordingly, the Subcommittee concluded, the Dispute Resolution Process "will not violate the parties' due process or constitutional rights."

The Durham Residents also contended that the Subcommittee's finding that the Project will serve the public interest was unreasonable and unlawful because the Subcommittee had failed to consider the impact of the Project on private property. See N.H. Admin. R., Site 301.16(b). The Durham Residents argued that, to consider the Project's impact on private property, the Subcommittee was required, and failed, "to determine the specific properties that will be impacted and the extent to which [those] specific properties will be impacted." The Durham Residents asserted that "without establishing the effect and the degree of effect on private properties, the Subcommittee could not [properly] balance the impacts and benefits of the Project" when determining whether it will serve the public interest.

The Subcommittee disagreed, deciding that it was required only to analyze and determine the Project's "impact on the economy of the entire region," rather than "the impact on the value of each individual parcel of private property." The Subcommittee found that, based upon the evidence

6

submitted, "the impact of the Project on real estate values will not rise to a level that will impact the economy of the entire region," and, therefore, will not "cause undue interference with the orderly development of the region." The Subcommittee further explained that it, in fact, considered the Project's impact on private property and, after balancing those impacts against the Project's benefits, it determined that the Project will serve the public interest. This appeal followed.

II. Analysis

A. Standard of Review

Decisions by the Subcommittee are reviewed pursuant to RSA chapter 541. Appeal of N. Pass Transmission, LLC, 172 N.H. 385, 401 (2019); see RSA 162-H:11 (2014). We will not set aside the Subcommittee's order except for errors of law, unless we are persuaded, by a clear preponderance of the evidence, that the order is unjust or unreasonable. Appeal of N. Pass, 172 N.H. at 401; see RSA 541:13 (2007). The Subcommittee's findings of fact are presumed prima facie lawful and reasonable. Appeal of N. Pass, 172 N.H. at 401. In reviewing those findings, our task is not to determine whether we would have found differently or to reweigh the evidence, but, rather, to determine whether the findings are supported by evidence in the record. Id. We review the Subcommittee's rulings on issues of law de novo. Id.

We defer to the Subcommittee's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence. Id. As the trier of fact, the Subcommittee resolves conflicts in the evidence and could accept or reject such portions of the evidence presented as it found proper. Id. As the appealing parties, the intervenors have the burden of demonstrating that the Subcommittee's order is clearly unreasonable or unlawful. See id.; see also RSA 541:13.

B. Appellate Arguments[1]

1. Right-to-Know Law

The intervenors first argue that the Subcommittee erred to the extent that it ruled that the Dispute Resolution Process is not subject to the Right-to-Know Law. They contend that the Right-to-Know Law applies to the Dispute Resolution Process because it was "form[ed] by a government entity," "addresses matters that are integrally tied to matters the SEC is required to

_____

[1] To the extent that the intervenors incorporate by reference their arguments in pleadings filed with the Subcommittee or in pleadings previously filed in this court, we do not address those arguments, but rather confine our review to those specifically articulated in their appellate briefs.

find under RSA 162-H:16, IV(b)," "assists the SEC in conducting the public's business of overseeing mitigation of the Project," and was a factor upon which the Subcommittee relied in issuing the Certificate.

We agree with Eversource that the intervenors' arguments are not yet ripe for our review. "Ripeness relates to the degree to which the defined issues in a case are based on actual facts and are capable of being adjudicated on an adequately developed record." Univ. Sys. Of N.H. Bd. of Trs. v. Dorfsman, 168 N.H. 450, 455 (2015) (quotation and brackets omitted). "[W]e have found persuasive the two-pronged analysis used by other jurisdictions that evaluates the fitness of the issue for judicial determination and the hardship to the parties if the court declines to consider the issue." Id. (quotation omitted).

Eversource contends that the intervenors' Right-to-Know Law arguments fail the second prong of the ripeness test. "The second prong of the ripeness test requires that the contested action impose an impact on the parties sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." Id. (quotation omitted).

Eversource asserts that the intervenors have not suffered an immediate or direct impact from the SEC's decision specifically related to the Right-to-Know Law. The intervenors do not identify any direct or immediate harm that they have suffered as a result of the SEC's decision related to the Right-to-Know Law. At oral argument, the intervenors conceded that no Right-to-Know request related to the Dispute Resolution Process had yet been made. Additionally, at oral argument, Eversource contended, and the intervenors did not dispute, that the parties have not yet participated in the Dispute Resolution Process and that the Dispute Resolution Administrator has not yet issued any final decisions related to that process.

The intervenors assert, generally, that they "have suffered direct, immediate, and uncompensated damages" from the Project itself (notwithstanding the fact that the Project has not yet been constructed). They contend that the Durham Residents "have applied for and received tax abatements from the Town of Durham for diminution of value to their property for 2018 caused by the Project," and that diminution in value "is an approved subject for the [Dispute Resolution Process]."

The intervenors also assert that one intervenor "filed a motion for enforcement of the conditions of the Order and Certificate where there are substantial uncompensated damages as well as the issue of Eversource's destruction of the very evidence [she] needed for the [Dispute Resolution Process]" and that, in response, the SEC determined that it lacked "jurisdiction to adjudicate property rights between private parties" and that "enforcement of the certificate conditions needed to be done before a court or in a declaratory ruling before the SEC."

As neither instance concerns harm suffered as a direct and immediate result of the Subcommittee's decision as to the Right-to-Know Law, we agree with Eversource that the intervenors' claims related to that law are not yet ripe for our review.

### 2. Private Property

The intervenors next argue that the Subcommittee failed to consider and make specific findings about "Private Property" when it determined that the Project will serve the public interest. See N.H. Admin. R., Site 301.16(b). They also assert that there was insufficient evidence related to "the Private Property Criterion," and that, without such evidence, the Subcommittee's finding that the Project will serve the public interest is necessarily unjust and unreasonable. (Bolding and italics omitted.) The intervenors contend that the Subcommittee's finding, "based on the limited evidence on Orderly Development, that there is an adverse impact" to private property, and the Subcommittee's failure to award compensation to individual property owners in the context of this proceeding, constitutes an unconstitutional taking of private property without compensation.

Relatedly, the intervenors argue that "[t]he failure to make a determination on Private Property kicks the proverbial can down the road to the [Dispute Resolution Process]." In this way, the intervenors argue, the Subcommittee impermissibly delegated its obligation to make a determination regarding the Project's impact on "Private Property" to the Dispute Resolution Administrator and shifts the burden of proof to the private property owners. The intervenors assert that the shift in the burden of proof violates their due process rights.

We disagree with the premise of all of the above arguments — that the private property interests that the Subcommittee considered are somehow different from those the Subcommittee was required to consider when determining whether the Project will serve the public interest. See RSA 162-H:16 (Supp. 2019).

RSA 162-H:16 provides that, after giving "due consideration" to "all relevant information regarding the potential siting or routes of a proposed energy facility, including potential significant impacts and benefits," the SEC "shall determine if issuance of a certificate will serve the objectives" of RSA chapter 162-H. RSA 162-H:16, IV. The stated objectives of RSA chapter 162-H are to: (1) "maintain a balance among . . . potential significant impacts and benefits" to "the welfare of the population, private property, the location and growth of industry, the overall economic growth of the state, the environment of the state, historic sites, aesthetics, air and water quality, the use of natural resources, and public health and safety" in decisions "about the siting,

9

construction, and operation of energy facilities in New Hampshire"; (2) avoid "undue delay" in constructing new energy facilities; (3) timely and fully consider the environmental consequences of energy facilities; (4) provide full and complete disclosure to the public about plans to construct such facilities; and (5) ensure that construction and operation of energy facilities "is treated as a significant aspect of land-use planning in which all environmental, economic, and technical issues are resolved in an integrated fashion." RSA 162-H:1 (Supp. 2019); see Appeal of N. Pass, 172 N.H. at 390-91.

Before the SEC may issue a Certificate, it must find that: (1) the applicant has adequate financial, technical, and managerial capability to assure construction and operation of the facility in compliance with the certificate; (2) the site and facility will not unduly interfere with the orderly development of the region with due consideration of the views of municipal and regional planning commissions and governing bodies; (3) the site will not have an unreasonable adverse effect on aesthetics, historic sites, air and water quality, the natural environment, and public health and safety; and (4) issuing the certificate will serve the public interest. RSA 162-H:16, IV; see Appeal of N. Pass, 172 N.H. at 391.

Site 301.16 sets forth the criteria relevant to a finding that a proposed energy facility will serve the public interest. Under Site 301.16, the SEC must consider: (1) the welfare of the population; (2) private property; (3) the location and growth of industry; (4) the overall economic growth of the state; (5) the environment of the state; (6) historic sites; (7) aesthetics; (8) air and water quality; (9) the use of natural resources; and (10) public health and safety. N.H. Admin. R., Site 301.16; see RSA 162-H:1.

In determining that the Project will serve the public interest, the Subcommittee specifically considered the comments from intervenors and members of the public regarding the Project's potentially adverse effects on aesthetics, historic sites, water quality, the environment, private property real estate values, tourism, land use, and public health and safety. The Subcommittee expressly found that the Project will have "some negative impacts" on those items, but determined that those negative impacts will be mitigated pursuant to the conditions imposed by the Subcommittee on the Certificate as well as those imposed on Eversource by other administrative agencies, the requirements set forth in the Memoranda of Understanding, and the dispute resolution procedure. The Subcommittee also considered the effect of the Project on the welfare of the population and economic growth, finding that increasing the reliability of the electric system will improve the public welfare and stimulate the economy of the region. Based upon this record, we cannot agree with the intervenors that the Subcommittee failed to consider the private property factor identified in Site 301.16 and RSA 162-H:1.

To the extent that the intervenors argue that the Subcommittee was required, and failed, to make an affirmative finding of fact as to each public interest criterion in Site 301.16, we disagree.  Neither the statutory nor regulatory scheme so requires.  See Appeal of N. Pass, 172 N.H. at 391-92.  Contrary to the intervenors' assertions, the Subcommittee's factual findings were sufficiently specific for appellate review.

We also disagree with the intervenors that the Subcommittee was required, in the context of this proceeding, to determine the extent of the Project's impact on each individual property and to compensate individual property owners for that impact.  To the extent that the intervenors argue that their property has suffered a diminution in value and that this diminution in value constitutes an unconstitutional regulatory taking without just compensation, they are free to pursue that claim in a court of competent jurisdiction.  See Burrows v. City of Keene, 121 N.H. 590, 598 (1982).

To the extent that the intervenors assert that the Subcommittee's finding that the Project will serve the public interest is not supported by the record, we also disagree.  Based upon our review of the record, we find ample support for the Subcommittee's finding.  We have reviewed the intervenors' remaining appellate arguments and conclude that they do not warrant extended consideration.  See Vogel v. Vogel, 137 N.H. 321, 322 (1993).

Affirmed.

HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.

11